**SIGNED THIS: November 25, 2008**

                                                               **MARY P. GORMAN**
                                                **UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

```
In Re                              )
                                   )    In Bankruptcy
TOMMY EUGENE BINGAMAN and          )
TARA MICHELLE BINGAMAN,            )    Case No. 07-72630
                                   )
          Debtors.                 )
_____    )
                                   )
FIRST NATIONAL BANK IN             )
  TAYLORVILLE,                     )
                                   )
          Plaintiff,               )
                                   )
     v.                            )    Adversary No. 08-7032
                                   )
TOMMY EUGENE BINGAMAN and          )
TARA MICHELLE BINGAMAN,            )
                                   )
          Defendants.              )
```

## O P I N I O N

This case comes before the Court for decision after trial of

an amended adversary complaint brought by the First National Bank in Taylorville ("the Bank") to determine the dischargeability of a $41,479.80 debt owed by the Debtors, Tommy Bingaman and Tara Bingaman, to the Bank.  The Bank alleges that the Bingamans, who were co-guardians of the estate of their minor daughter, breached their fiduciary duties and are guilty of defalcation by reason of their misappropriation of funds from their daughter's account at the Bank.  The Bank seeks a determination of nondischargeability of the resulting debt. Mrs. Bingaman defended the allegations against her by asserting that she was merely negligent.  Mr. Bingaman defended the allegations against him by claiming that he was not involved in the improper withdrawals.  For the reasons stated below, the Court will find the debt of the Bingamans to the Bank to be nondischargeable and will enter judgment accordingly.

The Bingamans' minor daughter received a personal injury settlement in May, 2002.  A probate guardianship for the daughter was opened and the Bingamans were appointed co-guardians of their daughter's estate pursuant to a probate court order entered on June 21, 2002.  As a result of the court order, $270,724.21 in settlement proceeds were deposited in a savings account at the Bank in the name of the daughter by the Bingamans as co-guardians. According to the probate court order, withdrawals from the account were to be made only upon further written court order and the signature of both co-guardians.

On July 2, 2003, $200,000 from the savings account was used to purchase a certificate of deposit at the Bank. The certificate of deposit was rolled over into a new certificate of deposit in the amount of $210,678.25 on July 6, 2005. The funds in the certificate of deposit were not used by the Bingamans and are not involved in the allegations of defalcation made in this case.

Between July 2, 2002, and November 15, 2005, the Bingamans made five withdrawals from the savings account in a total amount of just under $20,000. For each withdrawal, Mrs. Bingaman obtained a court order and both Mr. and Mrs. Bingaman went to the Bank to sign for the withdrawals.

The last of the five withdrawals occurred on November 14, 2005. Mrs. Bingaman had petitioned the probate court to be allowed to withdraw $10,000 to be used for her daughter's prospective medical expenses and the costs associated with her tumbling classes and competitions. The probate court allowed the withdrawal and at the same time noted on the court docket that "On the Court's own motion, the co-guardians directed to file annual accounts commencing November 1, 2006." The Bingamans withdrew the $10,000 and opened a checking account in their names for the benefit of their daughter. The account was opened with a $9,718.00 deposit. It is unclear why the full $10,000 was not deposited in the account.

From April 5, 2006, through July 18, 2007, thirty-nine

additional withdrawals were made from the savings account without court order.  One withdrawal in the amount of $3,000 was made in person by Mrs. Bingaman on April 5, 2006.  The remaining 38 withdrawals totaling $40,550 were made by Mrs. Bingaman by telephone using the Bank's Dial-A-Bank service.  Mrs. Bingaman signed for the April 5, 2006, withdrawal but no signatures were required for the telephone withdrawals.  The funds withdrawn from the daughter's savings account were generally transferred to the Bingamans' personal checking account and were used to make payments for the Bingamans' mortgage, vehicles, cable tv service, cell phones, groceries, utilities, and other household expenses.

Following the last telephone withdrawal on July 18, 2007, an audit conducted by the Bank disclosed the transfers from the daughter's savings account which were being made without court order and without the required signatures.  The Bank, through its attorneys, sent the Bingamans a letter dated August 6, 2007, which stated that there had been unauthorized withdrawals in the amount of $43,550 from their minor daughter's account.  The Bank demanded the immediate refund of the $43,550 plus interest.  In the alternative, the Bank suggested that the Bingamans petition the probate court for an order authorizing each withdrawal.  The Bingamans met with Bank officials and agreed to petition the probate court for *ex post facto* approval of the withdrawals.

On August 28, 2007, Mrs. Bingaman filed a petition seeking

approval of the withdrawals from the probate court.  Mrs. Bingaman requested $40,500 for taxes, vehicles, tumbling expenses, and other household expenses.  After hearing, in an order entered October 22, 2007, the probate court found that the majority of the withdrawals had been used for ordinary household expenses and that the Bingamans' use of their minor daughter's funds for such purposes evidenced "an astounding misuse of funds held in trust by the guardians."  The probate court observed that, if the Bank had not detected its own error, "the minor's estate could have been exhausted."  The probate court allowed $2,070.20 of the requested expenses and ordered the Bank to reimburse the minor's account for all amounts the Bingamans had withdrawn which were not approved by the court.  The Bank complied with the court order by reimbursing the daughter's savings account in the amount of $41,479.80 plus interest.

The Bank sought reimbursement from the Bingamans, but the Bank's collection efforts were halted when the Bingamans filed their petition under Chapter 7 of the Bankruptcy Code on December 20, 2007.  The Bank then filed this adversary proceeding seeking a determination that the debt is nondischargeable.

Section 523(a)(4) of the Bankruptcy Code provides an exception to discharge for debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]"  11 U.S.C. §523(a)(4).  This proceeding focused solely upon "defalcation while

acting in a fiduciary capacity".

To establish the non-dischargeability of the debt owed by the Bingamans, the Bank must establish the existence of an express trust or fiduciary relationship and a debt caused by the Bingamans' defalcation while acting as fiduciaries. *See* In re Hussain, 308 B.R. 861, 867 (Bankr. N.D. Ill. 2004). Each element of the cause of action must be established by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

Whether a debtor was acting in a fiduciary capacity for purposes of §523(a)(4) is a question of federal law, but state law is relevant to the inquiry. In re Howard, 339 B.R. 913, 919 (Bankr. N.D. Ill. 2006). Under Illinois law, a fiduciary duty exists between a guardian and a ward. Estate of Osborn, 128 Ill.App.3d 453, 455, 470 N.E.2d 1114, 1117, 83 Ill.Dec. 694, 697 (1984). The Seventh Circuit has held that, for purposes of dischargeability complaints, the fiduciary relationship must be based on an express trust or a relationship where there is a substantial inequality in power and knowledge. In re Marchiando, 13 F.3d 1111, 1116 (7th Cir. 1994).

The relationship of a guardian to a minor ward falls squarely within the parameters set by the Seventh Circuit. The Bingamans do not seriously contest that, by reason of their appointment as co-guardians of the estate of their minor daughter, they were

-6-

fiduciaries of their daughter.  The first element of proof was established by a preponderance of the evidence.

The second element of proof required to be established is that a defalcation occurred while the Bingamans were acting as fiduciaries.  "Defalcation" is not defined in the Bankruptcy Code.  Black's Law Dictionary defines "defalcation" as, *inter alia*, "the failure to meet an obligation; a non-fraudulent default." *Black's Law Dictionary*, *8th Edition,* p. 448 (2004).  Defalcation is determined on an objective standard, and neither intent nor bad faith is required. In re Pawlinski, 170 B.R. 380, 389 (Bankr. N.D. Ill. 1994).  As the Bingamans' attorney pointed out, mere negligence does not constitute defalcation.  Meyer v. Rigdon, 36 F.3d 1375, 1384-85 (7th Cir. 1994); In re Johnson, 691 F.2d 249, 257 (6th Cir. 1982).  Thus, some degree of culpability - more than negligence or mistake but less than fraud - is required to make a debt nondischargeable as a defalcation under §523(a)(4).  Hussain, 308 B.R. *at* 868.

The Bank has demonstrated by a preponderance of the evidence that the Bingamans' actions and omissions constituted defalcation while acting as fiduciaries.  As guardians of their daughter's estate, the Bingamans had a fiduciary duty to "manage the estate frugally" and to "apply the income and principal of the estate so far as necessary for the comfort and suitable support and education" of their daughter.  755 ILCS §5/11-13(b).  Instead of

using the account for the comfort, support, and education of their daughter, the Bingamans used the account as their personal piggy bank.  Numerous and substantial withdrawals from the account went to pay the personal debts of the Bingamans.  Several withdrawals were used to make the mortgage payment on the Bingamans' house. The Bingamans used funds from their daughter's savings account to make a $5,100 down-payment on a Dodge Caravan and a $3,100 down-payment on a Ford Taurus.  They also used funds from their daughter's savings account to make some of the monthly payments on those vehicles.  Additionally, they used funds from their daughter's account to make payments for their cable television, cell phones, groceries, and other household expenses.

Mrs. Bingaman admits that she was acting in a fiduciary capacity when she made the withdrawals from her daughter's account. However, she denies that the withdrawals constituted defalcation because she asserts that she was merely negligent and she did not know what she was doing.  Mrs. Bingaman relies on the probate court order of November 15, 2005, which required annual accounts to be filed as a defense for her conduct.  She asserts that the order relieved her and her husband of the obligation to seek court approval for each individual withdrawal and to have two signatures for each withdrawal.  The docket sheet from the probate case does not indicate that the probate court was relieving the Bingamans of those original requirements when it ordered the annual accountings

to be made.  Further, the probate court ultimately found the Bingamans and the Bank liable for their failure to continue to follow the original court order.  However, even if Mrs. Bingaman understood the November, 2005 probate court order to be substituting an annual accounting for the original requirements, that does not justify the Bingamans' use of their daughter's savings account for the payment of household bills.  The change, if any, made by the probate court was procedural in nature and does not support any substantive change in how the daughter's money was to have been used.

Further, although Mrs. Bingaman asserts that she relied on the annual accounting requirement in failing to petition the probate court for future expenditures and in failing to provide the Bank with two signatures for each withdrawal, her conduct when filing an annual accounting in 2006 further supports a finding of defalcation.  The November, 2005 probate court order required an annual accounting to be filed by November 1, 2006.  When the Bingamans did not make that filing, the probate court entered a further order on November 6, 2006 again requiring the accounting. The Bingamans filed their accounting on December 5, 2006 and represented on the document that it reported their "acts and doings in the administration of this case during the interim period from November, 2005 to November, 2006."  Their accounting, however, disclosed only the expenditure of $7,751 from the $10,000 withdrawn

Case 08-07032   Doc 23   Filed 11/25/08   Entered 11/25/08 10:27:33   Desc Main
              Document      Page 10 of 13

by court order in November, 2005 and affirmatively represented that $2,249 of that withdrawal remained on hand. The expenditures shown on the accounting were only those for their daughter's medical expenses and costs associated with her tumbling classes and competitions. The Bingamans did not disclose on the accounting the more than $14,000 Mrs. Bingaman had withdrawn from their daughter's account between April and November, 2006 which had been used to pay household expenses.

This Court finds that Mrs. Bingaman's conduct constituted much more than mere negligence. Mrs. Bingaman committed defalcation by improperly withdrawing funds from her daughter's account and using the funds for purposes other than the care, support, and education of her daughter. Mrs. Bingaman prepared a false accounting which was submitted to the probate court, thereby impliedly if not explicitly representing that no additional amounts had been withdrawn since November, 2005 and that the funds actually spent were only for medical expenses and her daughter's special activities. Mrs. Bingaman systematically looted her daughter's account and failed to properly account to the probate court after being ordered to do so. This conduct clearly rises to the level of culpability required to prove defalcation under §523(a)(4).

Mr. Bingaman contends that he was not involved in any of the withdrawals. Mr. and Mrs. Bingaman both testified that Mrs. Bingaman made all of the withdrawals at issue. Mr. Bingaman stated

that he had no knowledge of the withdrawals.

Mr. Bingaman cannot escape liability under §523(a)(4) by putting his head in the sand and claiming that he did not know what was going on with his daughter's accounts. As co-guardian of his daughter's estate, Mr. Bingaman was responsible for the "care, management, and investment of the estate." 755 ILCS §5/11-13(b). Mr. Bingaman had an affirmative duty to protect his daughter's funds, and he failed to take any steps to fulfill that duty. Mr. Bingaman's willful neglect of his fiduciary duty to manage his daughter's money constitutes defalcation. *See* Matter of Schwager, 121 F.3d 177, 185 (5th Cir. 1997).

Moreover, Mr. Bingaman was not a credible witness. His testimony that he did not know what was going on with his daughter's money was simply implausible. Prior to November 14, 2005, Mrs. Bingaman alone signed the petitions for withdrawal of funds which were filed with the probate court, but Mr. Bingaman went to the Bank with Mrs. Bingaman for each withdrawal because two signatures were required for each withdrawal. He did not sign for any withdrawals after November 14, 2005. Mr. Bingaman's testimony that he was unaware of any withdrawals after November 14, 2005, is undercut by the sheer amount of the withdrawals used for family expenses. Mr. Bingaman knew that Mrs. Bingaman had quit her job in 2005 and that the family's income was limited to the salary he earned as Chief of Police for Blue Mound, Illinois. He testified

that the family had monthly income of $3,200 and monthly expenses of $3,100.  In light of this tight budget, he must have been aware that another $40,550 was being pumped into the family budget over a 13-month period through Mrs. Bingaman's Dial-A-Bank withdrawals. In particular, Mr. Bingaman knew about the substantial down-payments made on the two vehicles because he signed the retail installment contracts on the vehicles.  Indeed, he was the only one to sign the contract on the Taurus because he was the only one with a job.  In addition, he knew that the vehicles required monthly payments of $509.97 on the Caravan and $347.83 on the Taurus.  Mr. Bingaman had to have known that Mrs. Bingaman was tapping into their daughter's account to pay these expenses.

Finally, Mr. Bingaman signed the false accounting that was filed with the probate court in December, 2006.  Because that accounting satisfied the probate court, it allowed the looting of his daughter's account to go on until July, 2007.  Even if he previously had no idea about his wife's withdrawals from the account, if Mr. Bingaman had made a minimal inquiry into the accuracy of the accounting at the time he signed it, the looting might have stopped.  Mr. Bingaman is fully culpable for his omissions and his conduct constitutes defalcation as a fiduciary.

As a result of the Bingamans' breach of their fiduciary duties regarding the care and management of their daughter's estate, the Bank was ordered by the probate court to reimburse $41,479.80 plus

interest to the daughter's account.  The Bank has established the validity of its claim and that the claim resulted from the defalcation of the Bingamans while acting in a fiduciary capacity. Even though the Bingamans' fiduciary duty was owed to their daughter and not directly to the Bank, the Bank is entitled to the entry of a nondischargeable judgment in its favor because it was required by court order to reimburse the daughter's account.  *See* In re Barnes, 317 B.R. 187, 193-94 (Bankr. M.D. Ga. 2004); In re Dauterman, 156 B.R. 976, 981 (Bankr. N.D. Ohio 1993); In re Butts, 142 B.R. 1011, 1012-13 (Bankr. M.D. Fla. 1992).

The Bank reimbursed the daughter's account in the amount of $41,479.80 plus interest.  The Bank presented no evidence of the amount of interest paid and does not seek judgment for interest in its complaint.  Accordingly, judgment will be entered in favor of the Bank and against the Bingamans in the amount of $41,479.80. The judgment will be determined to be nondischargeable pursuant to 11 U.S.C. §523(a)(4).

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###